Filed 4/20/21  P. v. Lizarraga CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077478 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF003180) |
| YOMAJARA LIZARRAGA, | |
| Defendant and Appellant. | |

APPEAL from an order granting probation of the Superior Court of Imperial County, William D. Quan, Judge.  Affirmed as modified.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorney Generals, for Plaintiff and Respondent.

Yomajara Lizarraga physically abused his girlfriend, M.T., repeatedly for nine months.  He was charged with injuring M.T., a person with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a); count 1), and false

imprisonment of M.T. by violence (Pen. Code, § 236; count 2).  He pled no contest to count 1 in exchange for dismissal of count 2.  The trial court suspended imposition of sentence and granted Lizarraga a three-year term of formal probation.[1]

Lizarraga appeals, challenging the imposition of certain probation conditions, fines and fees.  He asserts that (1) the criminal protective order ("CPO") and no contact probation condition were overbroad and violated his First Amendment right to free association, (2) the dangerous weapons probation condition is void for vagueness, and (3) the court erred in the imposition of fines and fees by failing to hold an ability to pay hearing, relying on an improper statute to determine ability to pay to all proposed fines and fees, and imposing non-punitive fees as probation conditions.

We agree that the court's order granting probation should be modified to the extent it imposed non-punitive fees collateral to the crime as conditions of probation instead of in a separate order.  We otherwise reject Lizarraga's contentions and affirm the order granting probation as modified.

FACTUAL BACKGROUND[2]

M.T. lived with her boyfriend, Lizarraga, and the couple's four-year-old child.  In February 2020, a police officer contacted M.T. to follow up on a report of past domestic violence.  M.T. told the officer that Lizarraga had been physically abusing her.  She reported Lizarraga had punched, kicked, and strangled her and showed the officer a visible injury to her left shoulder

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    The parties stipulated that the factual basis for Lizarraga's plea is set forth in the police report, which is summarized in the Probation Officer's Report.  The facts stated here are taken from the Probation Officer's Report.

caused by Lizarraga. In a subsequent interview at the police station, M.T. reported the following specific incidents of abuse.

In June 2019, Lizarraga began to hit and punch her during an argument. He hit her several times, but she did not report the abuse because she feared Lizarraga would retaliate.

In October 2019, Lizarraga and M.T. argued about her relationship with another male. During the argument, M.T. locked herself inside the bathroom because she was scared. Lizarraga forcibly opened the bathroom door, leaving a hole in it. He strangled M.T. and then pushed her to the ground, causing her to strike her head on a door knob. While she was on the ground, Lizarraga began to kick her in the upper torso and told her, " 'You are not better than me, if you will be with someone else I will kill you.' " After that day, Lizarraga hit M.T. several more times whenever they argued.

In February 2020, they argued again. This time, Lizarraga "punched [M.T.] with a closed fist causing her to lose balance and fall on the bed." Lizarraga kicked M.T. while she was on the bed with their sleeping child. He then threw beer all over the bedroom, wetting M.T. and the child. M.T. wanted to leave, but Lizarraga locked the doors and physically blocked her from leaving the home. The couple's minor son was present during at least two incidents of domestic violence.

After he was arrested and advised of his *Miranda*[3] rights, Lizarraga admitted that everything M.T. reported was true and that he needed help for his anger issues.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

DISCUSSION

I.

*The CPO and No Contact Probation Condition Are Constitutionally Valid*

A.    *The CPO and No Contact Probation Condition*

At the sentencing hearing, Lizarraga asked the court to not impose the probation officer's recommendation that he have no contact with M.T. Lizarraga's counsel advised the court that M.T. no longer feared Lizarraga because she believed he would change his behavior, now that "[h]e knows that she is willing and ready to call the police" and he is in "fear of being jailed and incarcerated." Lizarraga's counsel explained that M.T. had "a safety plan in place," including carrying a cell phone, calling the police "if things got heated between them," and going to her neighbor's residence to "seek safety." Counsel further advised the court that M.T. wanted to be able to discuss child-rearing issues and coordinate with Lizarraga on raising their child together.

The court asked M.T. if she had any comments about the CPO.[4] M.T. asked the court to remove the CPO previously issued at arraignment and not to continue prohibiting Lizarraga from having contact with her "[b]ecause of their son." She informed the court that she wanted to coparent with Lizarraga. The court explained to M.T., "that we can still protect you while allowing you to coparent your son," and, "[i]t would still be a stay away from

_____

[4]    We note that M.T. did not testify under oath at the sentencing hearing, contrary to Lizarraga's characterization of her comments; instead, she answered the court's inquiry over the telephone due to the COVID-19 restriction against in-person appearances. M.T. was also assisted by a non-certified court interpreter who, rather than always interpreting "word for word," sometimes provided the court with a "summation of what is being stated" by M.T.

4

you, but it will allow for contact and visitation with your son." The interpreter responded, "She understands, Judge . . .; however, she wants to remove the criminal protective order."

The court stated that it would issue the CPO subject to paragraph 16(b), an exception to allow for peaceful contact pursuant to any family court orders issued after the CPO. To this, Lizarraga's counsel requested that the court instead add a statement at the bottom of the CPO allowing Lizarraga and M.T. to "have peaceful contact for coparenting purposes." Counsel argued: "The problem with an Item 16 order, if that's the route the Court was thinking about going, is that it requires parties to go to court and to seek out future litigation, which, first of all, is going to be difficult during this COVID time period. [¶] Second of all, many parties have no interest in having family law orders pursued or in place. And I seriously doubt that's what [M.T.] wants. I don't know."

The court denied Lizarraga's request, stating that it was concerned by the nature of the abuse, M.T. had not sought the assistance of a domestic violence counselor to "empower" herself against any reoccurrence of abuse, and Lizarraga had not begun his anger management classes. The court informed M.T. that she could seek modification of the CPO after she had sought counseling and Lizarraga had enrolled in his classes. The court also declined to write in a term on the CPO for "peaceful contact for coparenting purposes," as suggested by Lizarraga, because it found that term to be "very vague" and "coparenting" needed to be defined. The court explained that a family court was better equipped than a criminal court to address "the facts and circumstances that will allow for access, visitation, and other things with regards to coparenting, legal/physical custody."

5

Accordingly, the court issued a three-year CPO for the protection of M.T. The CPO prohibited Lizarraga from having "personal, electronic, telephonic, or written contact with [M.T.]," including through a third party, except an attorney of record, or from coming "within 100 yards" of M.T. The court checked box 16(b) on the CPO form, permitting Lizarraga to "have peaceful contact with [M.T.], as an exception to the 'no-contact' or 'stay-away' provision[s] . . . only for the safe exchange of children and court-ordered visitation" as stated in any subsequently issued family court order. The court further ordered, as a condition of probation, that Lizarraga "shall have no contact" with M.T., including "any communication whether personally or through a third party and whether verbal, written or by non-verbal conduct" (the no contact probation condition), and "shall not annoy, harass or threaten" M.T.

B.     *Lizarraga's Contentions*

Lizarraga contends the CPO and no contact probation condition are unconstitutionally overbroad and violate his First Amendment right to free association. Lizarraga does not challenge the reasonableness or appropriateness of the CPO and no contact probation condition under the *Lent* test (*People v. Lent* (1975) 15 Cal.3d 481[5]); he challenges them only on constitutional grounds of overbreadth.

He argues the CPO and no contact probation condition amount to a "complete ban on association," because he is prohibited from all contact with M.T., "unless and until they sought out a separate family court order or the victim (M.T.) returned with sufficient proof of her participation with a

---

5     "*Lent's* subsidiary holding concerning the use of misdemeanors for impeachment was superseded by Proposition 8 in 1982." (*People v. Moran* (2016) 1 Cal.5th 398, 403, fn. 6.)

domestic violence counselor or program." He argues such a complete ban on association is not reasonably necessary or narrowly tailored to achieve the state's goals of protection and rehabilitation. He requests this court remand the matter for modification of the CPO and no contact probation condition to comport with constitutional requirements. As we explain, we find the CPO and no contact probation condition are not unconstitutionally overbroad.

C.    *Analysis*

"Section 1203.1 gives trial courts broad discretion to impose conditions of probation to foster rehabilitation of the defendant, protect the public and the victim, and ensure that justice is done." (*People v. Jungers* (2005) 127 Cal.App.4th 698, 702 (*Jungers*).) "If a probation condition serves to rehabilitate and protect public safety, the condition may 'impinge upon a constitutional right otherwise enjoyed by the probationer, who is "not entitled to the same degree of constitutional protection as other citizens." ' " (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1355 (*O'Neil*).) That is because probation is a privilege, not a right.

A probation condition that impinges on a constitutional right is unconstitutionally overbroad if it is not closely tailored and reasonably related to the compelling state interest in reformation and rehabilitation. (*People v. Delvalle* (1994) 26 Cal.App.4th 869, 879; *In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*).) "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.) We review constitutional

challenges to probation conditions de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

1.    *Elimination of Domestic Violence Is a Compelling State Interest*

The right that Lizarraga claims is violated by the CPO and no contact probation condition is not absolute. The "restriction of the right of association is part of the nature of the criminal process." (*People v. Robinson* (1988) 199 Cal.App.3d 816, 818.) Probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.' " (*Griffin v. Wis.* (1987) 483 U.S. 868, 874.) " 'Certain intrusions by government which would be invalid under traditional constitutional concepts may be reasonable at least to the extent that such intrusions are required by legitimate governmental demands.' " (*Jungers, supra,* 127 Cal.App.4th at p. 703.) "Consequently, restrictions on a probationer's right of association are permissible if reasonably required to accomplish the needs of the state." (*Ibid.*)

As Lizarraga acknowledges, "[t]he elimination of domestic violence is a compelling state interest." (*Jungers, supra,* 127 Cal.App.4th at p. 704.) "The Legislature's stated purpose in enacting the Law Enforcement Response to Domestic Violence Act (§§ 13700-13731; Stats. 1984, ch. 1609, § 3, p. 5713) was 'to address domestic violence as a serious crime against society and to assure the victims of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide.' (Stats. 1984, ch. 1609, § 1, p. 5711.) The Legislature expressed its intent 'that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior in the home is criminal behavior and will not be tolerated.' " (*Jungers,* at p. 704.)

8

Consistent with the Legislative mandate to provide victims with "maximum protection from abuse," a trial court granting a defendant convicted of domestic violence *must* issue "[a] criminal court protective order protecting the victim from further acts of violence, threats, stalking, sexual abuse, and harassment, and, if appropriate, containing residence exclusion or stay-away conditions." (§ 1203.097, subd. (a)(2).)  Here, the court was required to issue a CPO for M.T.'s protection when it placed Lizarraga on probation, despite M.T.'s claim that she did not want one.  The state's interest in protecting M.T. from further acts of violence justifies the restriction on Lizarraga's free association.

2.  *The CPO and No Contact Probation Condition Are Closely Tailored and Reasonably Related to the State's Interest in Protecting M.T. and Rehabilitating Lizarraga*

Lizarraga contends the restriction on his right to free association is unconstitutionally overbroad.  He argues the CPO and no contact order amount to "a complete ban on association" with M.T. because he is prohibited from all contact with M.T. "unless and until they sought out a separate family court order or the victim (M.T.) returned with sufficient proof of her participation with a domestic violence counselor or program."  He argues that given M.T.'s desire to have contact with him, along with her "willingness to report abuse and to remain cooperative with the prosecution" and "a reduced safety risk and lessened probability of future violations," the court "could have accomplished the goal of protecting M.T. by allowing [Lizarraga] to communicate with her in the event she initiated contact."  Relying on this court's decision in *Jungers*, *supra*, 127 Cal.App.4th 698, Lizarraga essentially

9

suggests that all CPOs that do not allow a defendant to respond to victim-initiated contact are unconstitutionally overbroad. We do not agree.

First, we reject Lizarraga's characterization of the trial court's orders as "a complete ban on association." Lizarraga and M.T. requested that the court fashion an order that would permit them to have contact for the purpose of coparenting their son. That is exactly what the court did. The court issued a CPO with a 16(b) exception, which provides Lizarraga the ability to "have peaceful contact with [M.T.], as an exception to the 'no-contact' or 'stay-away' provision[s] . . . only for the safe exchange of children and court-ordered visitation" as stated in any subsequently issued family court order. The court could have omitted the 16(b) exception, which would be a complete ban on association, but it did not. It granted the 16(b) exception "to make sure that Mr. Lizarraga, in fact, has an opportunity to go ahead and coparent or otherwise have contact with [his] son."

The court granted a 16(b) exception, rather than adopt the vague language proposed by Lizarraga, because it recognized the limitations of a criminal court to fully address child custody and visitation issues. Here, the couple's minor son had been exposed to at least two incidents of domestic violence between them. A family court, particularly in a case involving domestic violence, is far better positioned to evaluate the numerous factors in

10

issuing orders to allow for coparenting and to modify the CPO in a manner that ensured the safety of both M.T. and the child.[6]

Lizarraga argued a 16(b) exception was problematic because it requires the parties to go to Family Court, which might be difficult during the COVID-19 pandemic, "many parties have no interest in having family law orders pursued or in place" and he "seriously doubt[s] that's what [M.T.] wants." Not only is this speculative, since there was no evidence that Lizarraga or M.T. could *not* obtain a family court order, but any inconvenience to Lizarraga does not make the CPO unconstitutional. A condition that serves to rehabilitate and protect public safety "may 'impinge upon a constitutional right otherwise enjoyed by the probationer, who is "not entitled to the same degree of constitutional protection as other citizens." ' " (*O'Neil, supra,* 165 Cal.App.4th at p. 1355.) Contrary to Lizarraga's assertion, the court's orders did not "effectively terminat[e]" the parties' ability to communicate regarding their son.

Second, even though we reject Lizarraga's characterization of the court's orders as "a complete ban on association," courts have specifically upheld a complete ban on contact by a defendant from those the defendant is related by family or intimate association, including for example, spouses,

---

6    In making a custody and visitation determination, a family court is required to consider the state's public policy that "declares that children have the right to be safe and free from abuse, and that the perpetration of . . . domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child." (Fam. Code, § 3020, subd. (a).)  In modifying a protective order that is a condition of probation "in a case involving domestic violence, . . . the court shall consider [among other factors] . . . ¶ (H) Whether the change will impact any children involved, including consideration of any child protective services information." (§ 1203.3, subd. (b)(6)(H).)

11

romantic partners, siblings, and one's children. (See *People v. Race* (2017) 18 Cal.App.5th 211, 213-214, 220 [upholding CPO prohibiting a father, convicted of attempted lewd and lascivious acts on child under 14 against his niece, from contacting his daughter]; *O'Neil*, *supra*, 165 Cal.App.4th at p. 1356 [upholding probation condition prohibiting defendant from contact with her husband]; *People v. Celestine* (1992) 9 Cal.App.4th 1370, 1375 [upholding probation condition prohibiting defendant from contact with other drug users, including his girlfriend]; and *In re Peeler* (1968) 266 Cal.App.2d 483, 492-493 [upholding probation condition prohibiting defendant from contact with drug users, including her husband].)

Third, *Jungers* does not stand for the proposition that a CPO or probation condition must always allow a defendant to respond to victim-initiated contact to survive a constitutional challenge of overbreadth. In *Jungers*, the trial court's order prohibited the defendant from initiating contact with his wife, the domestic violence victim, but allowed the wife to initiate contact with him. (*Jungers*, *supra*, 127 Cal.App.4th at pp. 701-702.) Against a challenge that the trial court order was not narrowly tailored, this court noted the order "only assures that contact between them is acceptable to and welcomed by [the victim], thus supporting the state's compelling interest in preventing further incidents of violence, threats and harassment." (*Id.* at p. 705.) We concluded: "*As drawn*, the condition does not interfere with [the defendant's] marital relationship to an impermissible degree." (*Ibid.*, italics added.) Thus, this court in *Jungers* merely upheld the constitutionality of a CPO which allowed the defendant to return contact initiated by a victim against a challenge that it was not narrowly tailored.

We decline to extend *Jungers* beyond its facts and decline to state categorically that, to be constitutionally valid, a CPO must always allow a

12

defendant to respond to victim-initiated contact, even if the victim so desires. Such a rule would undermine the "Legislature's stated purpose in enacting the Law Enforcement Response to Domestic Violence Act (§§ 13700-13731; Stats. 1984, ch. 1609, § 3, p. 5713)" of " 'assur[ing] the victims of domestic violence the *maximum protection* from abuse which the law and those who enforce the law can provide.' " (*Jungers*, *supra*, 127 Cal.App.4th at p. 704, italics added.)

As this court recognized in *Jungers*, "victims of domestic violence often remain in abusive relationships" and "[i]n this regard, domestic violence statutes are meant to protect 'victims from participation or complicity in their own predicament.' " (*Id.* at p. 705, fn. 3, citing *People v. Gams* (1997) 52 Cal.App.4th 147, 153-154 (*Gams*).) Because the state is concerned with protecting domestic violence victims, even from their own actions, domestic violence statutes focus on protection of the victim and not on the victim's desires.

Additionally, a CPO that allows a domestic violence offender to respond to any victim-initiated contact presents a host of issues regarding enforcement of the order. For example, in the event of an alleged violation, a defendant (or an uncooperative victim) could lie and assert that it was the victim who initiated contact, to avoid the violation. If the victim initiates contact, it is unclear under such an order whether a defendant is permitted to respond an hour later, a day later, or a week later, or respond by appearing at the victim's home when the victim initiated contact only by a telephone call. Such an order would not only be difficult to enforce because of its vagueness, but it would essentially "place compliance with lawful court orders in the hands of the very people who often need the most protection from their own impotency." (*Gams*, *supra*, 52 Cal.App.4th at p. 154.)

13

In this case, Lizarraga physically abused M.T. for nearly nine months, with the violence occurring several times a month. Lizarraga punched, pushed, strangled, and kicked M.T in the torso while she lay on the ground. He threatened to kill her. And, on one occasion, he locked the doors and physically prevented her from leaving the home to escape the physical abuse. M.T. delayed reporting the physical abuse because she feared Lizarraga would retaliate. Although Lizarraga's counsel advised the court that M.T. no longer feared him, M.T. did not tell the court she was not afraid. She requested removal of the CPO "[b]ecause of their son."

The court also carefully considered Lizarraga's and M.T.'s interests in coparenting their son. The court limited the no contact and stay away provisions of the CPO to M.T. only; it did not include "any known member of their family because that will include the child." And as we previously discussed, the court granted a 16(b) exception "to make sure that Mr. Lizarraga, in fact, has an opportunity to go ahead and coparent or otherwise have contact with [his] son."

Given the severity of the abuse, the court was understandably concerned that M.T. had not received counseling from a domestic violence advocate, including to develop a safety plan, and that Lizarraga had not even enrolled in his court-ordered domestic violence classes. Although Lizarraga claims that "a reduced safety risk and lessened probability of future violations" warranted a CPO that allows him to communicate with M.T. if she initiated contact, we see nothing in the record to support that claim. The court told M.T., three times, she could seek modification of the protective orders once she took the necessary steps to "empower" herself against future

14

abuse and Lizarraga sought meaningful treatment for his anger and abuse issues.[7]

In sum, the CPO and no contact probation condition are carefully tailored and reasonably related to the state's compelling interest in protecting M.T. and reforming Lizarraga. We conclude the CPO and no contact probation condition are constitutionally valid.

## II.

### *The Dangerous Weapons Condition Is Not Void for Vagueness*

The court imposed a probation condition which requires Lizarraga to "not own, possess, or purchase any firearms, ammunition, and/or any other dangerous weapons." Lizarraga argued the condition "would include things like a kitchen knife while cooking" and requested the court "make an exception for kitchen knives or exception for while cooking or something along those lines." The court rejected Lizarraga's request to exempt kitchen knives, stating, "I am not going to make the exception for a kitchen knife. I think that there is going to be – if he's cooking, I highly doubt that that would impact that."

Lizarraga contends the probation condition requiring that he not possess "any . . . dangerous weapons" encompassed all dangerous weapons and "the court's apparent acceptance of possession of a kitchen knife while

---

7      Lizarraga argues that the CPO allows for contact as determined by a family law court but that no such provision exists in the no contact probation condition. As such, he asserts that the probation condition should mirror the CPO and the cause be remanded for clarification because he could comply with the family law order but violate probation. The concern is unfounded. As the trial court repeatedly explained, should the family law court order allow for peaceful contact for the purpose of custody and visitation, Lizarraga (or M.T.) could seek modification of the CPO and no contact probation condition. (§ 1203.3, subds. (a) & (b).)

15

cooking but not at any other time, created ambiguity." He asserts the dangerous weapons condition is void for vagueness and must be stricken. In his reply brief, Lizarraga changes his argument. He now proposes that there must be an " 'intent of the user to inflict, or threaten to inflict, great bodily injury' " in addition to possession and suggests we remand the matter to the court for clarification regarding the intent necessary when possessing common, but dangerous, household items.

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) Fair warning involves both providing adequate notice to the probationer and preventing arbitrary law enforcement. (*Ibid.*) A probation condition gives fair warning when it is " 'sufficiently precise for the probationer to know what is required of him, and for the [trial] court to determine whether the condition has been violated.' " (*Ibid.*) In determining whether a probation condition is sufficiently definite, a court is not limited to the condition's text. (*People v. Hall* (2017) 2 Cal.5th 494, 500.) "We must also consider other sources of applicable law [citation], including judicial construction of similar provisions." (*Ibid.*)

As Lizarraga notes, numerous household items can become dangerous weapons when misused, but are not intrinsically dangerous weapons. "Demonstrative of this precept are the following cases in which objects not inherently dangerous have been found to be a deadly weapon: a pillow [citation]; an automobile [citation]; a large rock [citation]; a razor blade [citation]; [and] a fingernail file [citation]." (*In re Jose R.* (1982) 137 Cal.App.3d 269, 276, fn. 3.) Accordingly, when defining what constitutes a dangerous or deadly weapon, courts have recognized two distinct classes of items: (1) "those instrumentalities which are weapons in the strict sense of

16

the word" such as "guns, dirks and blackjacks," and (2) those items that have an everyday use, such as knives, canes and hammers, but are deadly and dangerous based on the facts of a specific case. (*People v. Graham* (1969) 71 Cal.2d 303, 327-328, disapproved on other grounds as noted in *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029; *People v. Burton* (2006) 143 Cal.App.4th 447, 457.)

Here, Lizarraga claims the second class of items is vague and must include an intent requirement. The court in *In re R.P.* (2009) 176 Cal.App.4th 562, 566-567 (*R.P.*) considered and rejected an argument similar to Lizarraga's claim. There, the minor challenged on vagueness grounds "a probation condition prohibiting [him] from possessing any 'dangerous or deadly weapon.'" (*Id.* at p. 565.) The legal definition of a "'dangerous weapon'" "include[s] the harmful capability of the item and the intent of its user to inflict, or threaten to inflict, great bodily injury." (*Id.* at p. 568.) Hence, the court in *R.P.* concluded that the condition "prohibits [the minor] from possessing any item specifically designed as a weapon" and also "limits [the minor's] possession of any item not specifically designed as a weapon— [the minor] is barred from possessing any item belonging to this latter category if he *intends* to use the item to inflict or threaten to inflict death or great bodily injury." (*Id.* at p. 570, italics added.)

Under existing law, the challenged probation condition prohibits Lizarraga from possessing objects that are weapons in the strict sense and those objects whose circumstances of possession indicate that the item is *intended* to be used as a weapon. A household item, such as a kitchen knife, possessed and being used for its *intended* purpose, cannot constitute possession or control of a deadly or dangerous weapon. (*R.P.*, *supra*, 176 Cal.App.4th at p. 570.) As our high court noted, an item commonly used for a

17

nonviolent purpose qualifies as a weapon only when the attendant circumstances and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose. (*People v. King* (2006) 38 Cal.4th 617, 624.) Accordingly, we reject Lizarraga's contention that the challenged condition is constitutionally vague.

In any event, if Lizarraga is charged with a probation violation for possessing an ordinary household item, he is entitled to a formal hearing on the charge and probation cannot be revoked unless he is found to have willfully violated a probation condition. (*People v. Arreola* (1994) 7 Cal.4th 1144, 1152-1153 [discussing minimum constitutional requirements applicable to final revocation proceeding]; *People v. Moore* (2012) 211 Cal.App.4th 1179, 1186 [probation violation must be willful].)

III.

*Except as Modified, There Is No Reversible Error*<br>*in the Imposition of Fines and Fees*

Lizarraga contends that the court erred in the imposition of fines and fees by failing to hold an ability to pay hearing, relying on an improper statute to determine ability to pay to all proposed fines and fees, and imposing non-punitive fees as probation conditions. We agree that the court's order granting probation should be modified to the extent it imposed non-punitive fees collateral to the crime as conditions of probation instead of in a separate order. We otherwise find no reversible error in the imposition of fines and fees.

A.    *Fines and Fees Imposed*

Lizarraga requested that the court "strike all fines and fees based on his inability to pay at this time." In support of his request, Lizarraga's attorney argued Lizarraga was currently unemployed, "the only income for the family is state aid, which is basically intended to go to him and his child

18

to make sure they're in good shape."  The court denied Lizarraga's request, finding that he "does have the ability to pay" within a year under section 1203.1b, subdivision (e) because Lizarraga is "an able-bodied man of working age."

Accordingly, the court imposed a total of $1,095 in fines and fees, including: $300 state restitution fine (§ 1202.4, subd. (b)), $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)), $100 administrative fee for preparation of the probation report (§ 1203.1b, subd. (a)), $25 administrative collection processing fee (§ 1203.1b, subd. (h)), $40 court operation fee (§ 1465.8), $500 domestic violence fine (§ 1203.097, subd. (a)(5)), and $100 to a battered women's shelter (§ 1203.097, subd. (a)(11)(A)).  The court imposed and stayed a $300 probation revocation restitution fine (§ 1202.44).  The court also ordered Lizarraga to pay $25 per month for the reasonable costs of probation supervision (§ 1203.1b, subd. (a)), totaling $900 over three years.  The court directed Lizarraga to schedule a monthly payment plan with the probation department.

B.     *Substantial Evidence Supports the Trial Court's Finding of Lizarraga's Ability to Pay*

Lizarraga contends the court's imposition of non-punitive fines and fees, under sections 1465.8, 1203.1b, subdivisions (a) and (h), and Government Code section 70373, subdivision (a)(1), without conducting an ability to pay hearing violated his rights to due process under federal and state law, and the Eighth Amendment's prohibition against excessive fines. He requests that the non-punitive fines and fees be stayed and the matter be remanded to the court to determine whether he has the ability to pay the fines and fees.

The People respond that Lizarraga had an ability to pay hearing but failed to present any evidence to support his argument that he lacked the

19

ability to pay. Because Lizarraga raised the ability to pay issue and the court considered it, the People argue remand is not necessary for a second determination of Lizarraga's ability to pay. We agree with the People.

" 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." ' " (*People v. Allen* (2008) 44 Cal.4th 843, 869 (*Allen*).) At the sentencing hearing, and before the court pronounced sentence, Lizarraga requested that the court "strike all fines and fees based on his inability to pay at this time." His attorney argued Lizarraga was currently unemployed and the only income he received was state aid. Lizarraga, otherwise presented no evidence to support his claim that he was unable to pay the fines and fees. Nor did Lizarraga request that the court defer its ruling on the imposition of fines and fees so that he could present any additional evidence. After considering the parties' arguments, and the record, the court found that Lizarraga was "an able-bodied man of working age" and therefore had the ability to pay.[8]

The record shows that Lizarraga had an " 'opportunity to be heard "at a meaningful time and in a meaningful manner." ' " (*Allen*, *supra*, 44 Cal.4th

---

[8] The Probation Officer's Report indicated that, at the time of sentencing, Lizarraga was 23 years old, in good health with no history of psychological or medical problems, and lived with his parents and four younger siblings. He graduated from high school and was a full-time student at Imperial Valley College. Although currently unemployed, Lizarraga was previously employed from December 2018 to February 2019 and received $836 in cash aid and $480 in food stamps. Lizarraga informed the probation officer that he planned to become certified as a construction worker and support his family. The probation officer concluded that "[p]ursuant to Penal Code Section 1203.lb(e), [Lizarraga] has the ability to pay and reimburse costs as he has employable skills, employment history, and has the ability to seek employment within one (1) year."

20

at p. 869.) We therefore reject Lizarraga's claim that the matter must be remanded, for what would be a second hearing and further factfinding by the court regarding his ability to pay. (See *People v. Cowan* (2020) 47 Cal.App.5th 32, 48 (*Cowan*), review granted June 17, 2020, S261952 ["a sentencing court may not impose . . . restitution fines without giving the defendant, on request, an opportunity to present evidence and argument why such monetary exactions exceed his ability to pay"].)

The question becomes whether Lizarraga has shown that the court's factual finding on his ability to pay was erroneous. Although the issue is currently on review, we agree with those cases holding that the defendant has the burden of demonstrating an inability to pay fines and fees. (*Cowan*, *supra*, 47 Cal.App.5th at p. 49, review granted June 17, 2020, S261952; *People v. Santos* (2019) 38 Cal.App.5th 923, 934; *People v. Kopp* (2019) 38 Cal.App.5th 38, 96, review granted Nov. 13, 2019, S257844 to consider which party bears the burden of proof in an ability to pay hearing; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490.)

"Ability to pay does not necessarily require existing employment or cash on hand." (*People v. Staley* (1992) 10 Cal.App.4th 782, 785.) Here, the court relied on the undisputed statements contained in the Probation Officer's Report showing Lizarraga was a young man, in good health with a high school diploma, who lived with his parents, and attended college full-time. Although currently unemployed, he was previously employed and presented no evidence that he would be unable to work in the future. Based on the evidence before the court, we cannot conclude that its finding regarding Lizarraga's ability to pay the fines and fees lacked substantial evidence.

21

C.  *Any Legal Error in the Trial Court's Application of Section 1203.1b, Subdivision (e) to Determine Ability to Pay All Fines and Fees Is Harmless*

The court concluded that Lizarraga had the ability to pay all fines and fees and reimburse costs within a year under section 1203.lb, subdivision (e). Lizarraga contends the court committed legal error and, thus, abused its discretion when it relied on section 1203.1b, subdivision (e) to ascertain his ability to pay all fines and fees because this statute applies only to the fines and fees specified therein.

The People concede that the definition set forth in section 1203.1b "technically" did not apply to the court's determination of Lizarraga's ability to pay the fines and fees imposed under other sections. However, the People contend the error was harmless because the section 1203.1b definition was a more onerous standard than that required for costs imposed under other sections. We again agree with the People.

Subdivision (e) of section 1203.1b defines the term " 'ability to pay' " as "the overall capability of the defendant to reimburse the costs, or a portion of the costs, of conducting the presentence investigation, preparing the preplea or presentence report, processing a jurisdictional transfer pursuant to Section 1203.9, processing requests for interstate compact supervision pursuant to Sections 11175 to 11179, inclusive, and probation supervision, conditional sentence, or mandatory supervision, and shall include, but shall not be limited to, the defendant's: [¶] (1) Present financial position. [¶] (2) Reasonably discernible future financial position. In no event shall the court consider a period of more than one year from the date of the hearing for purposes of determining reasonably discernible future financial position. [¶] (3) Likelihood that the defendant shall be able to obtain employment within the one-year period from the date of the hearing. [¶] (4) Any other factor or

22

factors that may bear upon the defendant's financial capability to reimburse the county for the costs."

As the People concede, the section 1203.1b definition of ability to pay applies only to the costs set forth therein. Nonetheless, Lizarraga fails to explain how the court's application of this definition to fines or fees imposed under other sections prejudiced him, since application of section 1203.1b resulted in the court's considerations of a greater number of factors than is required. For example, the court imposed the mandatory minimum $300 state restitution fine under section 1202.4, subdivision (b)(1). The court, however, need only consider a defendant's inability to pay when "increasing the amount of the restitution fine in excess of the minimum fine . . . ." (§ 1202.4, subd. (c).) The court's use of the section 1203.1b criteria in determining Lizarraga's ability to pay the restitution fine actually benefited him. (See also § 1203.097, subd. (a)(5) [requiring court to consider a defendant's ability to pay $500 domestic violence fine, but setting forth no criteria to consider]; § 1203.097, subd. (a)(11)(A) [requiring court to determine a defendant's ability to pay $100 to a battered women's shelter which "may include his or her future earning capacity."].)

Since we discern no prejudice, any error in applying the section 1203.1b definition of "ability to pay" to all fines and fees was harmless beyond a reasonable doubt. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].)

23

D.  *Order Imposing Non-Punitive Fees as Probation Conditions Is Modified*

Lizarraga asserts the court abused its discretion by imposing the $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) and $40 court operation fee (§ 1465.8) as probation conditions.  The People respond that the record is unclear whether the court imposed the challenged assessment and fee as conditions of Lizarraga's probation but concede that Lizarraga's reading of the record is reasonable.  The People note that under this reading of the record, other fees were also improperly included as probation conditions, namely, the $100 administrative fee for preparation of the probation report (§ 1203.1b, subd. (a)), $25 administrative collection processing fee (§ 1203.1b, subd. (h)), and $25 per month fee for probation supervision (§ 1203.1b, subd. (a)).

When imposing sentence, the court suspended imposition of sentence and granted Lizarraga a three-year term of formal probation "subject to the [certain] terms and conditions," which include the assessment and fees listed above.  Courts have determined that probation supervision costs imposed under section 1203.1b cannot be made a condition of probation. (*People v. Hart* (1998) 65 Cal.App.4th 902, 907.)  Additionally, the court facilities assessment imposed under Government Code section 70373 and court security fee imposed under section 1465.8 are collateral to Lizarraga's crimes and punishment and should not be made a condition of probation. (*People v. Kim* (2011) 193 Cal.App.4th 836, 842-843 (*Kim*) [Gov. Code, § 70373]; *People v. Soto* (2016) 245 Cal.App.4th 1219, 1237 [§ 1465.8].)

24

Accordingly, we modify the order granting probation to reflect that the specified assessment and fees are separate orders and not conditions of probation.  (*Kim, supra*, 193 Cal.App.4th at pp. 847-848.)[9]

## DISPOSITION

The clerk of the trial court is directed to modify the order granting probation to reflect that the assessment and fees imposed under Government Code section 70373 and Penal Code sections 1203.1b and 1465.8 are separate orders and not conditions of probation.  The order granting probation is otherwise affirmed as modified.


DO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.

---

[9]    Lizarraga's failure to contest the imposition of the assessment and fees as probation conditions does not forfeit his argument on appeal because the imposition of the assessment and fees as conditions of his probation amounts to an unauthorized sentence.  Unauthorized sentences may be corrected on appeal at any time.  (*People v. Scott* (1994) 9 Cal.4th 331, 354.)